Filed 5/29/14  Vu v. Tran CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MATTHEW VU et al., | |
| Plaintiffs and Respondents, | G048587 |
| v. | (Super. Ct. No. 30-2009-00323184) |
| KEVIN TRAN et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Richard Luesebrink, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified.

Krongold Law Firm and Steven L. Krongold for Defendants and Appellants.

Law Offices of Michael J. Sundstedt, Michael J. Sundstedt and Lani M. Goodman for Plaintiffs and Respondents.

\*          \*          \*

## I.  INTRODUCTION

The trial court found Kevin Tran defrauded real estate investors Matthew Vu and Thanh Duc Lai by taking their money and spending it on himself rather than using it for the various projects in which they thought they were investing.  The ensuing judgment awards Vu $769,000 and Lai $1.6 million.  In this appeal, Tran presents a potpourri of arguments, some based on an asserted lack of substantial evidence to support aspects of the judgment, some based on more specific legal points.  The centerpiece argument is standing.  Tran claims Lai had no standing to seek recovery of about $915,000 of the $1.6 million awarded Lai because that $915,000 came from 23 investors who should have had to sue Tran separately, or at least give Lai an assignment of their rights.  (See Code Civ. Proc., § 367 ["Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute."].)  Tran's standing argument fails because there was substantial evidence the 23 investors *loaned* Lai their money, and he in turn invested it with Tran.

There is one matter that requires minor modification of the judgment.  The judgment includes an order that, literally, imposes a lien on a human being.  In this case, the trial judge put a constructive trust lien on Tran's father, Tom Tran.[1]  We can find no authority for a lien on a human being so we hereby strike from the judgment the provision putting a constructive trust lien on Tom Tran personally.

## II.  FACTS

### A. *The Four Projects*

In the summer of 2008, Tran interested Vu and/or Lai (or both) in a series of four real estate development projects:

(a)  a hotel in San Bernardino;

---

[1]    In this opinion Kevin Tran is the primary defendant.  Tom Tran is only involved because he received money from his son otherwise intended for real estate development.  Accordingly, we refer to Kevin Tran as "Tran" and his father more specifically as "Tom Tran."

2

(b) a Holiday Inn in Henderson, Nevada;

(c) a property on Railroad Street in Gulfport, Mississippi, aka the supermarket property; and

(d) a property on 25th Street in the same city.

Getting a handle on the precise chronology of events is a little difficult, since these four projects overlapped in time. By way of overview, however, Tran interested Lai in the first two projects sometime in June or July of 2008, while Vu only entered the picture in September 2008 when Tran succeeded in having Lai introduce Vu to him. We may summarize the relationship between the three men as things stood in that summer of 2008 this way: Tran was Lai's nephew-in-law and Vu was Lai's friend. Tran had Lai introduce him to Vu in early September 2008.[2]

Vu had heard about Tran "many times," in glowing terms, from Lai prior to their September 2008 introduction. Tran appeared to Lai to be a successful young man, driving around in a six-figure Mercedes. For his part Vu was a wealthy, successful businessman, whose habit was to make investments without written documentation, since his general approach to business was that if he trusted someone, he didn't need any documentation. This time, of course, that approach didn't work.

1. *The San Bernardino Hyatt*

In meetings in June and July 2008, Tran proposed a deal with Lai in which Lai (a) would contribute six parcels of land he owned in Apple Valley as the basis for a hotel in the area, and, in return, Tran (b) would contribute all the money to develop and entitle the property.[3] Tran would receive 55 percent of the profits and Lai 45 percent.

---

[2] There was testimony that when Vu met Tran, Tran impressed him with a bit of cell phone razzle dazzle. Tran told Vu that Vu's residence was (only) worth $1.1 million rather than the $1.43 million Vu had paid for it. Vu was not that internet-savvy at the time, so he was greatly impressed when Tran took out his cell phone and told Vu who had been the previous owner and gave him a series of comparisons of other houses in the area. Besides telling Vu he had overpaid for his house, Tran also said his house "was not good in feng shui."

[3] The record and briefing is somewhat ambiguous as to where entitlement ended and development began. Since Tran was ultimately found to not have attempted either, the point is academic for our purposes.

The idea was that after entitlements and development, Tran would sell the project to unnamed Chinese investors.

Tran proposed using an LLC he had already set up, Redlands Hyatt Hotels LLC, and Lai transferred all six parcels to that LLC. But then things began to fall apart. Tran told Lai he was out of money for the development, so Lai would have to contribute 45 percent of the development cost as well.[4] The estimated cost of development was $3 million, which meant Lai had to come up with about $1.35 million. To do that, Lai – though this fact is disputed even in this appeal – *borrowed* $914,950 from 23 various investors he was in contact with. He deposited that money into the LLC's joint bank account.

By this time Tran and Vu had connected, and, in the first quarter of 2009, Vu invested a total of $150,000 of his own money into the San Bernardino hotel project. As it turned out, though, *Tran's* actual interest in the project was zero. The man who was supposed to be Tran's project manager testified at trial that he simply had assisted Tran in looking at some property in the area, and, in fact, this "project manager" had never heard of the San Bernardino project, or any of Tran's other projects. He testified he was never paid by Tran to do *any* work on property development in the Apple Valley or Victorville area. Nothing ever came of the project.

2. *The Nevada Holiday Inn*

The Henderson, Nevada Holiday Inn project coincided with the San Bernardino hotel project. Here, Tran was collecting money for a real, ongoing business; unfortunately it was a business in which he had no ownership interest whatsoever.[5] Nonetheless, he told Lai and Vu he owned it. Tran told Lai he'd sell a 10-percent interest in the hotel, purportedly valued at $15 million, for $500,000. Since Lai was only able to pay $100,000 of the $500,000 buy-in at the time, he brought in Vu to help make up the

---

[4] This was about October 2008, and real estate generally was crashing at this time.

[5] There really is a Holiday Inn in Henderson, Nevada. There also is a real Brooklyn Bridge.

balance. The idea was Lai would only own 6 percent, and Vu would own the remaining 4 percent. Bringing in Vu, however, necessitated Lai selling to Vu his Gulfport, Mississippi Railroad Street property (discussed below). Vu would end up paying $200,000 for his 4 percent.

In January and May of 2009, Tran actually paid Lai and Vu dividends of around $5,000 for their supposed interest in the Henderson Holiday Inn. The money came from monies already in Tran's possession (apparently the joint LLC account on the San Bernardino Hotel project, discussed above). Tran eventually admitted he did not own the hotel. At all.

3. *The Railroad Street Property*

Lai bought the Railroad Street property in the wake of Hurricane Katrina in 2006. To obtain money to complete the purchase of his 10-percent share of the Henderson Holiday Inn, Lai offered to sell the Railroad property to Vu at a price of $550,000. The building had an income of $5,000 a month. There was already a mortgage on it of $275,000. The Lai-Vu deal was structured so that Vu would take over the mortgage, though Lai would still be the person ostensibly liable on it. Vu agreed, and gave Lai a $150,000 check as his initial deposit. He still owed Lai $400,000.

But then Vu met Tran in September 2008. Tran convinced Vu to change his investment. Tran convinced Vu they could purchase the Railroad property *together* for $550,000, with Vu plopping down $275,000 while Tran would then assume the remaining $275,000 mortgage, with a projected net income (after mortgage payment) of about $2,450. Tran never paid a penny on the mortgage, and the property was lost.[6]

---

6     Vu's testimony was that Kevin missed three payments, which was sufficient under Mississippi law to lose the property. We of course express no opinion on any applicable nuances regarding Mississippi property foreclosure law.

## 2. *The 25th Street Property*

In addition to the Railroad Street property, Lai's holdings in Gulfport, Mississippi, included a three-unit property on 25th Avenue. That also got tied up with Tran. The tripartite transaction here was similar to that involving the Railroad property: Lai had $88,000 in equity in a property worth $800,000 (the mortgage balance was $712,000), so the deal was that Vu and Tran each would pay Lai $44,000 and jointly assume 50-50 responsibility for the mortgage. But later all three men agreed Tran would manage the building *and* make the mortgage payments. Tran never paid his $44,000 buy-in, never made any payments, and that property too was lost to foreclosure.

## B. *The Litigation*

The inevitable litigation began in late November 2009, with Lai filing suit against Tran. Vu followed in early January 2010, and filed yet another action in October of the same year, this one seeking to set aside a deed of trust which Tran had put on Vu's personal residence on Ambrose Street in Huntington Beach in favor of his father, Tom Tran. Lai did the same in November 2010. By April of 2011 all four cases were consolidated, and the parties had agreed to a bench trial.

The case came to trial in the summer of 2012, but it would not be until March 27, 2013, that judgment would be entered. As mentioned, the judgment provides for compensatory damages of $769,000 in favor of Vu and $1.6 million in favor of Lai. Both plaintiffs were also awarded the same amount in punitive damages.

In addition, the court provided equitable relief. Tran was enjoined from doing anything to detract from the value of five of the six parcels Lai had transferred to the LLC,[7] and was ordered to transfer all his ownership interest in the LLC to Lai and Vu. The court also voided a deed of trust Tran had given to his parents on his own home in Huntington Beach (the Ambrose residence). Concomitantly the court imposed a

---

[7] These five had been owned free and clear by Lai at the time of the transfer to the LLC.

"Constructive Trust lien in favor" of Vu and Lai on the Ambrose Street house in the amount of $164,204. Finally, the court imposed "a Constructive Trust lien against Tom Tran in favor of plaintiffs Matthew Vu and Thanh Lai for $75,857.01." After a timely motion for new trial and its denial on May 17, 2013, Tran appealed within the month.

### III. DISCUSSION

A. *Overview*

In appellate law, arguments are identified by headings and subheadings in the opening brief. (See Cal. Rules of Court, rule 8.204 ["Each brief must: . . . [¶] State each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority . . . ."].) Accordingly, arguments not set forth in a heading or subheading are deemed waived. (E.g., *Conservatorship of Hume* (2006) 139 Cal.App.4th 393, 395, fn. 2; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345 fn. 17; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.) We mention this point, because in its statement of issues, the opening brief identifies one issue as to whether the trial court applied the "proper burden of proof" to support the punitive damage awards. But there is no heading or subheading on that particular subject to be found in the opening brief. There isn't even any text on it. So we begin by concluding that whatever the merits of Tran's various arguments, the question of the correct burden of proof in regard to the punitive damage awards is not before us.

We should also identify a number of other arguments Tran *doesn't* make that one might expect him to make, given the complexity of the facts in this litigation. He doesn't claim the trial judge got his math wrong in calculating Vu's damages to be $769,000 and Lai's $1.6 million. He doesn't claim the evidence is insufficient to support either number per se. (Though he does make an argument about a component of Lai's $1.6 million which we address in part IIIB below). Tran doesn't claim the evidence compels a finding that he did not defraud either Vu or Lai, or that their money was lost

7

because of the general downturn in the economy and not because he simply took their money and spent it on himself. Tran has also clearly abandoned two of his main lines of defense asserted at the trial level. He no longer asserts that, as regards the San Bernardino and Henderson, Nevada hotel projects, he was merely selling "'membership interest[s]'" in whatever he wanted to do about the projects, so the money was really "his personal money." Nor does he argue *Lai* was the bad guy who was in the process of defrauding his own set of investors in a company Lai controlled called TDL. Finally, he doesn't argue that the imposition of a lien on his house in favor of Vu and Lai somehow conflicts with state homestead law.

What Tran *does* argue may be grouped into several categories. The first is a set of three arguments essentially centered on the theory those investors who handed over (we will not use the word loan for the moment) $914,950 to Lai for the San Bernardino project should have sued Tran individually. The second is a point about evidence of reliance, Tran's theory being Vu couldn't have relied on Tran in making a $150,000 investment he lost, because he hadn't yet even met Tran. Then come three sets of what are essentially double recovery arguments. Finally, Tran makes one meritorious argument about the lien imposed, literally, on his father. That is the only winner.

B. *The Three Standing Arguments*

Tran's first set of three challenges goes after the biggest component of the judgment, the $914,950 from 23 investors that found its way into the $1.6 million award to Lai.[8] The legal ground of the challenge is based on section 367 of the Code of Civil Procedure, already quoted. But Tran's actual argument, as set forth in the opening brief, is nothing less than a challenge to the court: Tran's brief practically dares us to find

---

[8]     The itemization of the investors and the amounts invested is found in exhibit 4 (page 4-030 in the Exhibit Book). The original includes notes apparently made by the trial judge. The itemization is reproduced in the opening brief.

evidence all of the 23 investors merely loaned money to Lai instead of giving it to him for a capital contribution.[9]

Appellate procedure doesn't work that way. An appellate court is not obligated to search the record seeking evidence to support a judgment. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Rather, the rule is that an appellant must state all of the evidence in its brief or it waives the alleged error. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1274.) The argument that the 23 investors should have each sued Tran individually has thus been waived on appeal.[10]

It would fail anyway. There is substantial evidence the $914,950 came from loans to Lai, for which he is responsible. Lai himself testified in no less than two places in the record that he borrowed the money to invest in the San Bernardino hotel project. Also two of Lai's creditors came to court and testified they *loaned* him money for the San Bernardino project. That is substantial evidence.

Perhaps more importantly, nothing prevented Tran from deposing or subpoenaing any of the 23 lenders in order to try to establish that somehow they thought they were making an equity investment in a hotel as distinct from lending money to Lai. Ironically, Tran even argues there was no evidence any of the 23 sources of money to Lai

---

9    "The Court is not being asked to weigh credibility or resolve conflicts in the evidence. Rather, Kevin [Tran] simply asks the Court to find any substantial evidence to support a reasonable inference that all of Lai's twenty-three investors personally loaned him the money such that Lai alone could sue for the losses sustained."

10    The argument is developed in considerably more detail in the reply brief. The reply brief asserts that since only two of the investors (who gave Lai a total of $400,000 between then) were brought into court to corroborate the loan characterization of the funds, there was a lack of hard evidence as to the precise relationship between Lai and the *non-testifying* investors (covering the remaining $514,950). We will address this point in the text.

The reply also points to a supposed statement by Lai himself that he asked shareholders in his own company, TDL, to invest in a land project, not lend him money. This is a case of, to put it charitably, wishful thinking on appeal. The record reference given, pages 97 through 99 of the reporter's transcript, doesn't support the characterization in the reply at all. In fact, by the end of the passage – at page 99, lines 5 through 9, it is clear that Lai was *borrowing* money: "Did you tell Kevin Tran that you did not have enough money and you had to borrow money to complete the land entitlement project? [¶] A. Yes. I tell him that I don't have enough, but I try to get it, my portion."

9

dealt *independently* with Tran, as if that somehow supports his standing argument. It doesn't: Such a lacuna is totally consistent with the idea that the 23 investors did not intend to buy into a hotel, they were merely content to lend money to Lai for *him* to buy into a hotel. If the 23 were all lenders, all they had to do was satisfy themselves Lai's credit was good; Tran would be irrelevant.

C. *Vu's Reliance in Regard to his $150,000 investment*

If we understand the fourth of Tran's arguments correctly, it is that because Vu paid money to Lai for the purchase of the Railroad property prior to ever meeting Tran ($150,000), Vu couldn't have relied on anything Tran said in making his investment. The theory is that while Tran may have "caused the loss" he didn't *cause Vu to part with* his money.

The answer to this contention is that Vu's claim is not based on his initial investment per se, but on Vu's reliance on Tran's promise to *manage the property and pay the mortgage*. Recall that Vu was originally going to buy the property outright, but when he met Tran, the investment changed so that Tran and Vu would jointly own the property together. More importantly, part of that deal was that Tran's share of the buy-in on the Railroad property was his promise to take over the mortgage payments and pay the mortgage. Vu relied on Tran's promise to make the mortgage payments, and it was that reliance that caused his loss, including his original $150,000.

D. *Double Recovery?*

Tran's first double recovery argument goes like this: The trial court ordered Tran to transfer his entire interest in the LLC (sometimes called the RHH LLC) to Lai and Vu jointly. But, since all value in the LLC consists of the six parcels which *Lai* transferred into it, Vu is receiving a windfall: Vu is receiving back, by way of the judgment, the monetary value of his investment *plus* some as-yet undetermined share of the appreciation in the land.

10

Ironically, it is this argument that founders on the shoals of standing. Tran doesn't have standing to complain of any windfall *to Vu*, since any such windfall would come at *Lai's* expense. Tran makes no argument *he* deserves any share of the LLC. Tran contributed nothing to the RHH LLC. As to Lai's rights against Vu or vice versa, that is another case and is not before us.

Tran's second double recovery argument centers on Tran's personal residence on Ambrose street. In March 2010, as this litigation was commencing, Tran signed a deed of trust in favor of his father, Tom Tran for $450,000. The trial court simply voided the deed of trust as a transfer to defraud Tran's creditors. (See Civ. Code, § 3439.04.) Tran argues voiding the lien amounts to giving Vu and Lai a double recovery because they already have a money judgment.

The answer to this argument is that Tran is confusing the fact of a monetary award with a potential source of the money to pay that monetary award. To the degree that the voiding of the trust deed allows Vu and Lai a *source* to satisfy their money judgment, Tran will get credit for it as against the amount of the money judgment. (See Ahart, Cal. Prac. Guide: Enf. J. & Debt, Ch. 6D-1, at ¶ 6:304 (The Rutter Group 2014) ["Property sold or collected: Thereafter, the debtor's interest in the property may be sold at an execution sale and the proceeds applied to satisfy the judgment."].)[11]

Tran's third double recovery argument has to do with the voiding of a lien on Ambrose in favor of Tom Tran, namely the imposition of a lien of Ambrose in the amount of $164,205.32 in favor of Vu and Lai. The figure came from monies given by Vu and Lai to Tran, and then traced from Tran's personal bank account used to pay down the existing mortgage on the property. Again, Tran raises the spectre of double recovery since Vu and Lai already were awarded monetary damages. And again, the source-

---

[11] And for what it's worth, there was substantial evidence Tran's supposed debt to his father was a sham. Tran had filed for bankruptcy almost a year before, in early April 2009, but didn't disclose any loans from his father. And his father Tom admitted at trial he never expected to be paid.

11

amount distinction is the answer. Tran must receive credit as against the existing money judgment for any amounts realized from execution of the lien by Vu or Lai.

E. *The Lien on Tom Tran*

Finally, we come to the lien on Tran's father. The theory of the lien on Tom Tran is that son transferred $75,857.01 from his own account to his father, hence the court placed a lien on his father for that amount. The problem is, it's a lien on *him*, not any property of his that might have been traced back to the fruits of his son's defrauding of Lai or Vu.

We don't allow liens on human beings in this country anymore. (See U.S. Const., 13th amend.; *Chrystal v. Huntington Nat'l Bank* (M.D. Fla. 2010) 2010 U.S. Dist. LEXIS 146068 [rejecting argument that human beings could be liened on as vessals under admiralty law].) We may merely note here that Vu and Lai point to no statutory authority allowing any such liens and we cannot imagine it exists.

## IV.  DISPOSITION

The judgment is affirmed in all respects except to correct that part which provides for a constructive trust lien imposed on Tom Tran personally. As to that part, we hereby modify the judgment to strike the lien on Tom Tran, and, as modified, we hereby affirm the judgment. Given the lopsided result, respondents are to recover their costs on appeal.


                                        BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

12